UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------x
IN RE GOOGLE DIGITAL ADVERTISING                    21-md-3010 (PKC)
ANTITRUST LITIGATION
                                                    OPINION AND ORDER
-------------------------------------------------------------x
INFORM INC.,

                            Plaintiff,               23-cv-1530 (PKC)

        -against-

GOOGLE LLC, ALPHABET INC. and
YOUTUBE, LLC,

                            Defendants.
-------------------------------------------------------------x

CASTEL, Senior District Judge:

           Plaintiff Inform Inc. ("Inform") was an online video publisher whose videos

typically ran on the websites of non-party news publications.  For example, alongside a

newspaper's story about wildfires, a reader could view an Inform-produced video about wildfire

risks that featured an advertisement for property insurance.  Inform alleges that it was driven out

of business by Google's anticompetitive conduct.

           Inform brings Sherman Act claims against defendants Google LLC, Alphabet

Inc. and YouTube, LLC (collectively, "Google"), asserting that Google gave anticompetitive

advantages to its own online video advertising platform, YouTube.  Inform's claims center

principally on the market for online video advertising, which Inform alleges to be a defined

product market in which Google has monopoly power.  Inform's claims also relate to other

product markets, including publisher ad servers, ad-buying tools and ad exchanges.

           Close familiarity with these products, the relevant terminology, and the broader

ecosystem of digital advertising technology is assumed throughout, and is set forth in greater

detail in the Court's prior decision on Google's motion to dismiss claims brought by the attorneys general of sixteen states and Puerto Rico (the "States"). See In re Google Digital Advert. Antitrust Litig., 627 F. Supp. 3d 346 (S.D.N.Y. 2022) (the "2022 Opinion"). This Opinion and Order will also reference the Opinion and Order of March 1, 2024 that ruled on Google's motions to dismiss the claims of other private party plaintiffs (the "2024 Private Plaintiff Opinion"). See In re Google Digital Advert. Antitrust Litig., 2024 WL 895155 (S.D.N.Y. Mar. 1, 2024).

Pursuant to Rule 12(b)(6), Fed. R. Civ. P., Google moves to dismiss the Sherman Act claims set forth in Inform's Second Amended Complaint (the "Complaint"). For the reasons that will be explained, Google's motion will be granted in part and denied in part.

BACKGROUND.

Inform was an online video company that matched third-party publishers' breaking news stories to its original video content, incorporated its videos into those publisher websites, and coordinated the placement of targeted ads within its videos. (Compl't ¶¶ 2, 47.) Inform collected third-party data about users and had the ability to target ads to specific demographics. (Compl't ¶ 53.)

By 2014, Inform had become "hugely successful," with 27 million unique monthly viewers. (Compl't ¶ 3.) At its peak, Inform worked with approximately 5,000 publishers, mostly consisting of national and local publishers. (Compl't ¶ 52.) In 2014, Inform signed a term sheet in which Yahoo, Inc. agreed to pay $375,000,000 to acquire Inform, although the deal fell apart, and Yahoo entered into "an advertising pact" with Google. (Compl't ¶¶ 55-57.) Inform is now out of business. (Compl't ¶ 57.)

Inform was a customer of Google's DFP ad server and frequently transacted on AdX.  (Compl't ¶ 60.)  Inform also transacted direct ad buys through ad agencies, and relied on ad exchanges to fill inventory that went unpurchased by direct buyers.  (Compl't ¶¶ 61, 63.)  Direct sales were more profitable to Inform.  (Compl't ¶ 64.)  Among its claims, Inform asserts that the DFP ad server circumvented Inform's direct ad sales by channeling its already-sold inventory to AdX, where Google was able to earn a percentage of the auction transaction while undermining Inform's more-profitable direct sales.  (Compl't ¶¶ 229-35.)

Inform asserts that Google's market dominance across the ad-tech industry required it to rely on Google's products, specifically including the DFP ad server, AdX and the Chrome browser.  (Compl't ¶ 65, 175.)  Inform asserts that ad servers and web browsers work together to assure that an ad is properly placed and functions as designed, and that Inform was "forced" to make its product compatible with DFP and Chrome.  (Compl't ¶ 66.)  The DFP ad server delivered Inform's ads and tracked impressions, click-through rates, completion rates and other metrics.  (Compl't ¶ 67.)  The DFP algorithm forecasted the fill rate and chose whether to fill inventory using one of Inform's directly-sold ads or a "programmatic" ad transacted through Google.  (Compl't ¶ 67.)

In addition to asserting Google's monopoly power in ad servers and ad exchanges, Inform also asserts that, through YouTube, Google has monopoly power in the market for online video advertising.  (Compl't ¶¶ 108-16.)  Inform alleges that online video advertising is a relevant market, which includes component submarkets in instream and outstream video advertising.[1]  (Compl't ¶¶ 108-10 & n. 17.)  It asserts that online video ads are

---

[1] An instream ad runs as part of the video that a viewer is watching, such as an ad running at the start of the video. (Compl't ¶ 108.)  An outstream ad runs while the user scrolls the page, such as a video that automatically plays in the margin of a website.  (Compl't ¶ 108.)

the most effective form of video advertising because online advertises are able to track viewer interactions with the ad.  (Compl't ¶ 112-14.)  The Complaint asserts that YouTube has a 52% share of the market for online video advertising.  (Compl't ¶¶ 115-16.)

Inform also asserts that Google has monopoly power in certain adjacent markets, including markets for web browsers (64.68% market share for Google Chrome), internet search (92% market share) and Licensed Mobile Device Operating Systems ("LMDOS") for smartphones and tablets (asserting that Google's Android product has 75% of the LMDOS market).  (Compl't ¶¶ 136-57.)  Inform attempts to distinguish the Android OS from Apple's popular operating system on the grounds that Apple's OS is proprietary and not licensable. (Compl't ¶ 153.)

Several of Inform's claims are specific to the market for online video advertising. Inform asserts that Google conditioned the sale of its YouTube ad inventory (the tying product) to the use of Google's separate ad-buying tools (the tied products).  (Compl't ¶¶ 178-83.)  It also asserts that around 2014, Google began initiatives to shift video publishers away from publishing video content on Adobe's Flash infrastructure and instead require them to publish videos through HTML5.  (Compl't ¶¶ 240-261.)  According to Inform, this was a disruptive, arbitrary and anticompetitive measure, one that Google imposed through its monopoly power in the Chrome browser.  (Compl't ¶¶ 240-261.)  Inform asserts that during the transition from Flash to HTML5, Google gave special benefits to YouTube and the customers of other Google products, which caused competitive injury to Inform and other online video companies.  (Compl't ¶¶ 240-61.)

In addition to alleging that it was a competitor of Google and YouTube in the market for online video advertising, Inform also asserts that it was a customer of Google's DFP ad server and transacted on AdX, and that it was injured by certain alleged ad-auction

manipulations.  Inform brings several claims that parallel those brought by other private plaintiffs and the States, including section 2 claims directed to Dynamic Allocation, Enhanced Dynamic Allocation, Project Bernanke and Dynamic Revenue Sharing.  (Compl't ¶¶ 189-239.) It also asserts an unlawful tie of Google's ad server to AdX.  (Compl't ¶¶ 168-77.)

This action was originally filed in the Northern District of Georgia in 2019 and conditionally transferred by the JPML to the undersigned in 2023 for coordination as part of the MDL proceeding.  (23 Civ. 1530, ECF 66.)  In 2021, the transferor court granted Google's motion to dismiss Inform's First Amended Complaint, concluding that it was a "shotgun pleading" that failed to give adequate notice of its claims and that Inform did not plausibly allege antitrust standing.  (See id., ECF 51.)  The Eleventh Circuit reversed in an unpublished opinion. Inform Inc. v. Google LLC, 2022 WL 3703958 (11th Cir. Aug. 26, 2022) (per curiam).  The Eleventh Circuit analyzed whether the then-operative pleading satisfied Rules 8(a)(2) and 10(b), Fed. R. Civ. P., and did not decide whether Inform had plausibly alleged a claim for relief as to any particular theory advanced by Inform.  Id. at *4-5.  The Eleventh Circuit also held that Inform had plausibly alleged antitrust standing, pointing to a variety of claimed antitrust injuries and concluding that Inform was an efficient enforcer of the antitrust laws.  Id. at *5-6. RULE 12(b)(6) STANDARD.

The Court incorporates the standard for plausibly alleging a claim for relief under the Sherman Act as set forth in the 2022 Opinion.  See 627 F. Supp. 3d at 366-67 (citing Bell Atlantic Corp. v. Twombly, 550 U.S. 544 (2007), and Ashcroft v. Iqbal, 556 U.S. 662 (2009)).

DISCUSSION

I.    The Complaint Plausibly Alleges Google's Monopoly
      Power in the Market for Online Video Advertising.

    The Complaint brings section 2 claims asserting monopolization and attempted

monopolization against Google in the market for online video advertising.  (Compl't ¶¶ 321, 329,

337.)  Defendants urge the Complaint does not plausibly allege monopoly power or probability

or intent to obtain monopoly power in the online video advertising market.

    "To state a claim for monopolization under Section 2 of the Sherman Act, a

plaintiff must establish (1) the possession of monopoly power in the relevant market and (2) the

willful acquisition or maintenance of that power as distinguished from growth or development as

a consequence of a superior product, business acumen, or historic accident."  In re DDAVP

Direct Purchaser Antitrust Litig., 585 F.3d 677, 686-87 (2d Cir. 2009) (quotation marks and

brackets omitted).  "Monopoly power is the power to control prices or exclude competition.  It

can be proven directly through evidence of control over prices or the exclusion of competition, or

it may be inferred from a firm's large percentage share of the relevant market."  Geneva Pharms.

Tech. Corp. v. Barr Laboratories Inc., 386 F.3d 485, 500 (2d Cir. 2004) (quotation marks and

citation omitted).

    Monopoly power may be demonstrated by direct or indirect proof:

    Monopoly power may be proven directly by evidence of the control
    of prices or the exclusion of competition, or it may be inferred from
    one firm's large percentage share of the relevant market.  Indirect
    proof of market power, that is, proof that the defendant has a large
    percentage share of the relevant market, is a 'surrogate' for direct
    proof of market power.  Courts often rely on indirect proof of market
    power because direct measures are often difficult or impossible to
    prove.

Heerwagen v. Clear Channel Comme'ns, 435 F.3d 219, 227 (2d Cir. 2006) (quotation marks and citations omitted), overruled on other grounds, In re IPO Sec. Litig., 471 F.3d 24, 37 (2d Cir. 2006).  "'Sometimes, but not inevitably, it will be useful to suggest that a market share below 50% is rarely evidence of monopoly power, a share between 50% and 70% can occasionally show monopoly power, and a share above 70% is usually strong evidence of monopoly power.'" Tops Markets, Inc. v. Quality Markets, Inc., 142 F.3d 90, 99 (2d Cir. 1998) (quoting Broadway Delivery Corp. v. United Parcel Service of America, Inc., 651 F.2d 122, 129 (2d Cir. 1981)). "Absent additional evidence, such as an ability to control prices or exclude competition, a 64 percent market share is insufficient to infer monopoly power." PepsiCo, Inc. v. Coca-Cola Co., 315 F.3d 101, 109 (2d Cir. 2002).  "If a plaintiff can show that a defendant's conduct exerted an actual adverse effect on competition, this is a strong indicator of market power.  In fact, this arguably is more direct evidence of market power than calculations of elusive market share figures." Todd v. Exxon Corp., 275 F.3d 191, 206 (2d Cir. 2001).

The Complaint cites various figures connected to YouTube's market share.  Most important to its allegations of monopoly power, it states: "YouTube's share of the overall online video advertising market is at least 52% percent [sic] in the United States and climbing. YouTube's share of the instream online video advertising [sic] is much higher."  (Compl't ¶ 116.)  The Complaint includes allegations about YouTube's broader popularity apart from the video advertising market.  In 2020, approximately 77% of United States internet users aged 15-25 used YouTube, and "amongst older-age groups," its "reach was at least 67 percent." (Compl't ¶ 116.)  Without giving a time interval, Inform cites a 2023 source asserting that YouTube is visited by 81% of all United States adults, 95% of 18-29 year olds, 91% of 30-49 year olds and 49% of those older than 65.  (Compl't ¶ 181.)  Another allegation states that "the

YouTube platform is now at a dominant 76% market share . . . ."  (Compl't ¶ 180.)  The
Complaint states that 62% of YouTube's users visit the site daily.  (Compl't ¶ 181.)

The Court understands Inform to allege that YouTube has a 52% market share in
the online video advertising market, that its share of instream online video advertising is higher,
and that additional allegations about YouTube's overall popularity go toward the plausibility of
these allegations.  Market share is indirect evidence of a defendant's monopoly power, and the
market share attributed to YouTube in online video advertising and instream advertising is on the
low end of the 50-70% range that "can occasionally show monopoly power . . . ."  Tops Markets,
142 F.3d at 99.  To plausibly allege monopoly power, Inform also must point to "additional
evidence, such as an ability to control prices or exclude competition . . . ."  PepsiCo, 315 F.3d at
109.

Accepting the Complaint's allegations as true, the Court concludes that Inform
has alleged that Google's conduct exerted an actual adverse effect on competition, sufficient to
make the allegation of monopoly power plausible.  The Complaint plausibly alleges that through
its Chrome browser, Google abruptly transitioned from allowing video platforms to play through
the long-established Adobe Flash to HTML5, and disabled Flash advertisements in order to
"steal" the online video market.  (Compl't ¶¶ 241-44.)[2]  During this transition, Flash continued to
work for YouTube, but not competitors like Inform.  (Compl't ¶¶ 244, 252.)  The transition to
HTML5 was exclusionary and disruptive to non-Google competitors but convenient for
advertisers that switched to Google products.  (Compl't ¶¶ 246-51, 253-54, 263.)  Google
purportedly "syphoned off" customers of Inform and other competitors, which "withered and

---

[2] Inform relies on the manner in which the transition from Adobe Flash to HTML5 was implemented shows that
Google had monopoly power.  Separately (and in the next section of this Opinion) the Court considers whether
Google's conduct relative to the transition to HTML5 is plausibly alleged to be anticompetitive.

died" as "Google and YouTube plundered valuable video advertisements that had supported publishers' websites." (Compl't ¶ 247.) Google urges that the use of HTML5 in its products was an innovation-based and non-exclusionary design decision that still allowed for customer choice. The Court can better assess the impact of the introduction of HTML5 and the discontinuance of Adobe Flash except as to YouTube after the close of fact discovery rather than on a Rule 12(b)(6) motion. See, e.g., Anderson News, L.L.C. v. Am. Media, Inc., 680 F.3d 162, 185 (2d Cir. 2012) ("The choice between two plausible inferences that may be drawn from factual allegations is not a choice to be made by the court on a Rule 12(b)(6) motion.").

Inform has identified additional practices of YouTube and other Google ad tech products that allegedly solidified YouTube's monopoly power in online video advertising. It alleges that through Chrome, Google's has continued to allow YouTube videos and their ads to auto-start when loaded, but has prevented auto-start from functioning for Inform and other competitors. (Compl't ¶¶ 256-57.) It alleges that Google has made Flash ads unrenderable on mobile devices and imposed size requirements that disrupted non-Google video ads. (Compl't ¶¶ 264-65.) These allegations further support the allegations of Google's monopoly power in the online video advertising market.

The Complaint also includes facts that plausibly describe how Google and YouTube used advertiser demand for YouTube to channel advertisers to Google's ad-buying tools, thereby strengthening Google's market power in the video advertising market. (Compl't ¶¶ 178-82.) According to Inform, in 2015, Google began to "force[]" advertisers to use DV360 or Ad Words to advertise on YouTube after previously giving access to competing ad-buying tools. (Compl't ¶ 179-80.) This diverted ad spend away from Inform and other online video advertisers while strengthening the market power of YouTube and Google's ad-buying tools.

9

(Compl't ¶ 182.)  The facts alleged in this tying claim support the plausibility of Inform's allegations that Google has monopoly power in the online video advertising market.

The Complaint's allegations about the percentage of Google's market share in the online video advertising market, buttressed by its allegations of practices having an actual adverse effect on competition, support an inference of monopoly power.  See, e.g., PepsiCo, 315 F.3d at 109; Todd, 275 F.3d at 206.  Google's motion based on Inform's allegations of monopoly power in the market for online video advertising will be denied.

II.    The Complaint Plausibly Alleges that Google's Transition
       from Flash to HTML5 Was Anticompetitive.

Inform alleges that Google used its monopoly power in the markets for web browsers and ad servers to prevent competing video advertisers from using the once-popular Adobe Flash software and require them to adopt HTML5.  (Compl't ¶¶ 240-66.)  "[T]he possession of monopoly power will not be found unlawful unless it is accompanied by an element of anticompetitive conduct."  Verizon Commc'ns Inc. v. Law Offices of Curtis V. Trinko, LLP, 540 U.S. 398, 407 (2004) (emphasis in original).  Google urges that the Complaint fails to plausibly allege anticompetitive conduct based on Google's transition from Flash to HTML5.  "The pertinent inquiry in a monopolization claim . . . is whether the defendant has engaged in improper conduct that has or is likely to have the effect of controlling prices or excluding competition, thus creating or maintaining market power."  PepsiCo., 315 F.3d at 108; see also In re Google Digital Advert. Antitrust Litig., 627 F. Supp. 3d at 379-81 (summarizing legal standards for alleging monopolization and attempted monopolization).

According to Inform, Flash was the standard software for playing web videos and was popular among publishers because it provided control and flexibility.  (Compl't ¶ 241.) Inform asserts that Google wanted to exercise more control over video software, so beginning in

2014, it "rolled out changes" in Chrome and the Google Display Network to convert from Flash to HTML5.  (Compl't ¶¶ 242-44.)  The Complaint asserts that Flash was a proprietary technology owned by Adobe, whereas HTML5 was an open-source technology that permitted Google to act as an "enforcer" through the Chrome browser.  (Compl't ¶¶ 255-56.)  As described in the Complaint, Google obstructed the use of Flash in increments that had the effect of impairing Google's competitors and advantaging YouTube.  In January 2015, YouTube announced that it would stop using Flash by default and instead would play video on Chrome through HTML5.  (Compl't ¶ 244.)  As described by Inform, however, YouTube was secretly "whitelisted" so that its Flash video ads actually continued to play over Chrome, even though Flash was blocked for Inform and other Google rivals.  (Compl't ¶ 244.)

Beginning in 2015, Google began to automatically convert Flash campaigns to HTML5, but only for users of Google's ad-buying tools and certain third-party tools that contracted with Google.  (Compl't ¶ 245.)  Advertisers then faced the choice of manually converting their content from Flash to HTML5 through a costly and lengthy process, or using Google products, which automatically converted content to HTML5 on their behalf.  (Compl't ¶ 246.)  Inform alleges that this had the effect of coercing video advertisers into using Google products rather than persuading them on the merits.  (Compl't ¶ 246.)  Publishers were similarly affected, because they were deprived of ad inventory while advertisers manually transitioned to HTML5 or converted to Google products.  (Compl't ¶ 247.)  Publishers were also coerced into transacting for programmatic ad inventory through AdX because their direct relationships with advertisers were disrupted as advertisers worked through the transition to HTML5.  (Compl't ¶ 247.)

In 2017, Google changed Chrome's default settings to disable Flash entirely. (Compl't ¶ 249.)  Unless a web user manually changed Chrome's default settings, the user would not be able to view a Flash-formatted video.  (Compl't ¶¶ 250-51.)  However, YouTube remained exempt from this change, meaning that Flash-based video ads shown through YouTube were still visible to users.  (Compl't ¶ 252.)  The Complaint asserts that through HTML5, Google controls whether a video will autostart or play without sound, and that it has permitted YouTube to autoplay while "shut[ting] down" competitors' videos.  (Compl't ¶¶ 256-57.)  Inform asserts that advertisers were able to track the efficiency of their ad spend and observed that YouTube was delivering superior results relative to the non-Google competition.  (Compl't ¶¶ 259-60.)

In urging that the claim should be dismissed, Google relies on materials that go well beyond the four corners of the Complaint.  Specifically, Google points to press reports about Steve Jobs's hostility toward Flash, Flash's lack of compatibility with Apple products and an industrywide transition away from Flash.  (Def. Mem. at 6-7.)  It also urges that the transition to HTML5 was merely a product redesign that should not give rise to antitrust liability.  See generally Berkey Photo, Inc. v. Eastman Kodak Co., 603 F.2d 263, 286 (2d Cir. 1979).  But Inform has alleged facts that, if true, describe a transition to HTML5 that favored YouTube-based video advertisements while impairing competition from video advertisements published through Inform and other online video advertisers.  Inform plausibly alleges why the rollout of HTML5 harmed competition across the market for online video advertising and did not merely cause harm to Inform as a competitor.  The materials cited by Google are not susceptible to judicial notice and may not be considered on a Rule 12(b)(6) motion.

Google's motion to dismiss Inform's claims premised on the conversion from Flash to HTML5 will be denied.

III.    Google's Motion to Dismiss Inform's Tying Claims Will Be Denied.

    A.    Overview of Inform's Tying Claims.

Count IV asserts tying under sections 1 and 2 of the Sherman Act and Count V asserts tying under section 3 of the Clayton Act.  (Compl't ¶¶ 344-71.)  Inform alleges that Google coercively tied access to online video advertising in YouTube to the use of Google's ad-buying tools.  (Compl't ¶ 352.)  It separately asserts that Google coercively tied access to its AdX ad exchange to use of its DFP ad server.  (Compl't ¶ 347.)

    "A tying arrangement is 'an agreement by a party to sell one product but only on the condition that the buyer also purchases a different (or tied) product, or at least agrees that he will not purchase that product from any other supplier.'"  Eastman Kodak Co. v. Image Tech. Servs., Inc., 504 U.S. 451, 461 (1992) (quoting Northern Pacific Railway Co. v. United States, 356 U.S. 1, 5-6 (1958)).  "To state a valid tying claim under the Sherman Act, a plaintiff must allege facts plausibly showing that: (i) the sale of one product (the tying product) is conditioned on the purchase of a separate product (the tied product); (ii) the seller uses actual coercion to force buyers to purchase the tied product; (iii) the seller has sufficient economic power in the tying product market to coerce purchasers into buying the tied product; (iv) the tie-in has anticompetitive effects in the tied market; and (v) a not insubstantial amount of interstate commerce is involved in the tied market."  Kaufman v. Time Warner, 836 F.3d 137, 141 (2d Cir. 2016); accord E & L Consulting, Ltd. v. Doman Indus. Ltd., 472 F.3d 23, 31 (2d Cir. 2006).

    B.    Inform Plausibly Alleges Antitrust Standing as to the Claimed YouTube Tie.

Google urges that Inform's claim of an unlawful tie between YouTube and Google ad-buying tools should be dismissed because Inform does not compete in the market for ad-buying tools and therefore cannot allege antitrust injury.  For the reasons explained by the

Eleventh Circuit in its analysis of Inform's antitrust standing, Google motion to dismiss on antitrust standing grounds will be denied.

"Competitors and consumers in the market where trade is allegedly restrained are presumptively the proper plaintiffs to allege antitrust injury." In re Aluminum Warehousing Antitrust Litig., 833 F.3d 151, 158 (2d Cir. 2016) (quotation marks omitted). "[H]owever, 'Congress did not intend the antitrust laws to provide a remedy in damages for all injuries that might conceivably be traced to an antitrust violation.'" Gatt Commc'ns, Inc. v. PMC Assocs., L.L.C., 711 F.3d 68, 75 (2d Cir. 2013) (quoting Associated General Contractors of Cal., Inc. v. California State Council of Carpenters, 459 U.S. 519, 534 (1983)). Identification of an antitrust injury "involves a 'three-step process' in which, first the plaintiff must 'identify the practice complained of and the reasons such a practice is or might be anticompetitive'; then the court must 'identify the actual injury the plaintiff alleges' by 'look[ing] to the ways in which the plaintiff claims it is in a worse position as a consequence of defendant's conduct'; and finally, the court must 'compare the anticompetitive effect of the specific practice at issue to the actual injury the plaintiff alleges.'" Harry v. Total Gas & Power N. Am., Inc., 889 F.3d 104, 115 (2d Cir. 2018) (quoting Gatt, 711 F.3d at 76).

As noted, the transferor court in the Northern District of Georgia previously dismissed Inform's claims for lack of antitrust standing. The Eleventh Circuit reversed, stating:

> As for antitrust injury, Inform has alleged that it lost millions of dollars because Google excluded it from competing in the online advertising markets. The amended complaint also asserts that Google excluded all competitors from the online advertising markets by disabling and disparaging its competitors' products and services; illegally conditioning the purchase of ads on its subsidiary YouTube on Google's ad-buying tools; using its control over the dominant ad auction to preference its own offerings and disadvantage those of rivals; and purposefully rendering some of its

> dominant products and services incompatible with its competitors' offerings.
>
> Google allegedly did all of that to avoid and eliminate competition, rather than meet it on the merits. And in so doing, Google not only harmed its competitors, but also hurt consumers, allegedly degrading their privacy, stifling innovation, raising prices, and decreasing the quality and variety of products available to consumers. These allegations suffice to establish antitrust injury at the pleading stage.

Inform, 2022 WL 3703958, at *6. It also concluded that Inform was an efficient enforcer of the antitrust laws. Id.

For the reasons explained by the Eleventh Circuit, the Court concludes that Inform has antitrust standing to pursue its tying claim against YouTube. The Eleventh Circuit specifically considered Inform's claim that Google was "illegally conditioning the purchase of ads on its subsidiary YouTube on Google's ad-buying tools" as indicative of antitrust injury. Id. Inform did not offer ad-buying tools that competed with Google's, but it is implicit in the Eleventh Circuit's analysis that the tie allegedly harmed Inform by coercively channeling users of Google's ad-buying tools to transact on YouTube instead of its competitors in online video advertising.

Google's motion to dismiss for lack of antitrust standing will be denied.

C. Inform Plausibly Alleges that It Was Coerced into Using the DFP Ad Server.

Google separately urges that Inform "has pleaded itself out of court" on its claim asserting a tie between the DFP ad server and AdX. (Reply Mem. at 15-16.) The 2022 Opinion concluded that the States had plausibly alleged that Google unlawfully tied use of the DFP ad server to AdX. See 627 F. Supp. 3d at 367-70.

Google notes that Inform has alleged that its direct ad sales were far more lucrative than the ads sold on ad exchanges, including AdX, where it transacted "leftover" or

"remnant" inventory.  (Compl't ¶¶ 13, 37, 63-64.)  Inform also asserts that it preferred to transact on exchanges other than AdX because other exchanges offered high prices to publishers. (Compl't ¶¶ 64, 189.)  Google argues that, given Inform's reliance on direct advertisements and its low regard for AdX, it cannot plausibly claim that it was coerced into using DFP in order to access AdX inventory.

Inform asserts that it was a consumer of both DFP and AdX, and that it was "forced" to use DFP in order to access the real-time bids on AdX, even though it viewed DFP as an inferior ad server.  (Compl't ¶ 60.)  Google does not dispute that, like the States, Inform has plausibly alleged that AdX has monopoly power in the ad-exchange market.  (Compl't ¶¶ 132-35.)  Inform also asserts that it paid Google for the use of the DFP ad server and also paid a revenue-share fee to AdX.  (Compl't ¶ 317.)

Inform has plausibly alleged that it was coerced into using the DFP ad server in order to access AdX.  That Inform preferred to sell ad sales directly and sought to transact on exchanges other than AdX does not suggest a lack of coercion in being forced to use DFP in order to access the market's dominant ad exchange product.  Inform, like the States and other plaintiffs, has identified reasons why AdX was purportedly less advantageous to publishers than other ad exchanges, but, given AdX's purported monopoly power, accessing ad inventory on the exchange was desirable and necessary.

Google's motion to dismiss the tying claim related to the DFP ad server will be denied.

IV.    <u>Inform's Leveraging Claims Will Be Dismissed.</u>

    A.    <u>Overview of Inform's Leveraging Claims.</u>

Count II asserts monopoly leveraging, and leveraging is also listed among the monopolization claims asserted in Count I.  (Compl't ¶¶ 321, 327-35.)   Inform has three leveraging theories that turn on the interrelationship between Google's market power in its Android OS, Chrome browser and internet search, and their alleged effects on the online video advertising market.  (Compl't ¶¶ 285-99.)

"Within the context of § 2 claims, the Supreme Court has recognized the impropriety of monopoly leveraging, <u>i.e.</u>, the use of monopoly power in one market to strengthen a monopoly share in another market."  <u>Virgin Atl. Airways Ltd. v. Brit. Airways PLC</u>, 257 F.3d 256, 272 (2d Cir. 2001); <u>see also id.</u> at 273 ("to support a monopoly leveraging claim a plaintiff must show a defendant possesses monopoly power in one market and uses it to gain a competitive advantage in a different distinct market.").  A plaintiff must plausibly allege that the defendant "(1) possessed monopoly power in one market; (2) used that power to gain a competitive advantage . . . in another distinct market; and (3) caused injury by such anticompetitive conduct."  <u>Id.</u> 272.  The plaintiff must also allege "a 'dangerous probability of success' in monopolizing a second market . . . ."  <u>Trinko</u>, 540 U.S. at 415.

    B.    <u>Inform Does Not Plausibly State a Leveraging Claim Directed to Android OS.</u>

Inform asserts that Google has leveraged Android OS's dominant position in the market for mobile-device operating systems to "require[ ]" the mobile-device manufacturers using Android to automatically install a Google Search app and the Chrome browser on new devices, thereby letting Google "control" the online video advertising market.  (Compl't ¶ 288-92.)  It asserts that Google offered device manufacturers "a cut" of search-advertising revenue

that Google earned from the use of its apps on the device.  (Compl't ¶ 289.)  The Google Search app and Chrome are both characterized as "default" apps exclusively pre-installed on such devices.  (Compl't ¶ 289.)  Inform describes the requirement to install Google Search and Chrome as a "self-preference" that ultimately gave Google the power to favor its own advertising products over those of Inform and other competitors, including in online video advertising.  (Compl't ¶¶ 290-91.)

It is not apparent to the Court that Inform has plausibly alleged Google's monopoly power in the market for mobile operating systems.  (See Compl't ¶¶ 153-57.)  Inform alleges a worldwide market share for Android OS but not the percentage of its United States market share, which is the relevant geographic market identified in the Complaint.  (Compl't ¶¶ 154-55.)  Inform attempts to distinguish the Android OS from Apple's OS because the Apple product is proprietary and Google's is licensable, but the Complaint does not explain the significance of this distinction.  (Compl't ¶ 153.)  The Complaint does not appear to allege the market share of Android OS in the United States in the market for licensable operating systems or the market for mobile operating systems as a whole.  For the purposes of this motion, and because Google has not raised the issue, the Court assumes that Inform adequately alleges Google's monopoly power in the market for mobile operating systems.

The Complaint fails to allege leveraging based on the monopoly power of Android OS.  It asserts that Google induced manufacturers to preinstall the Google Search app and Chrome by offering a percentage of ad-search revenue gained from the app, but it does not describe how these apps' preinstallation contributed to the market power of Chrome and Google Search.  Inform does not claim that users were prevented from installing apps that competed with Google Search and Chrome.  And the ultimate effect of this purported leveraging on the market

for online video advertising is further attenuated.  The Complaint alleges that Chrome's

installation helps Google "control the entry points" for online video advertising, and then

excerpts a Congressional report that includes no mention of video advertising.  (Compl't ¶¶ 291-

92.)  These leveraging allegations are vague and do not plausibly describe an effect on Inform or

the market for online video advertising writ large.

Google's motion to dismiss this leveraging claim will be denied.

C.  Inform Does Not Plausibly State a Leveraging
      Claim Directed to General Internet Search.

Inform separately asserts that Google leverages its power in the market for

general internet search to coerce publishers of mobile ads to use AMP and favor YouTube in

order to monopolize on the online video advertising market.  (Compl't ¶¶ 293-98.)  It asserts that

Google perceived Inform and other competitors as threats to its dominance in online video

advertising so it required publishers to use AMP in part to block Flash advertisements and header

bidding.  (Compl't ¶ 296.)  According to Inform, Google then rewarded publishers who adopted

AMP by giving them higher rankings in search results and punished non-AMP publishers by

dropping their search rankings.  (Compl't ¶ 297.)  The Complaint also asserts that Google gave

YouTube "premium placement" in search results, even when competing videos had more

engagement.  (Compl't ¶ 298.)

The Court need not recount the particulars of AMP, which is discussed in the

2022 Opinion and the 2024 Private Plaintiff Opinion, except to note that they are a mobile web-

page format that Google implemented with the explanation that they improved load speed, and

that plaintiffs have commonly alleged that AMP was in truth adopted to favor Google's products.

(Compl't ¶¶ 293-97.)  While other plaintiffs have focused on AMP's role in obstructing header

bidding, Inform also asserts that AMP was designed to block Flash video and force advertisers to adopted HTML5.  (Compl't ¶ 296.)

Inform does not state a leveraging claim for substantially the reasons explained in the 2022 Opinion's analysis of AMP, 627 F. Supp. 3d at 398-99, and in the Court's discussion of the leveraging claims brought by the Daily Mail and Gannett in the 2024 Private Plaintiff Opinion, 2024 WL 895155, at *24-25, 27.  Inform's claim differs from other plaintiffs' in its emphasis on AMP's obstruction of Flash, but like the other plaintiffs, it does not plausibly allege that AMP did not provide for faster load times as promised or that faster load times were a mere pretext for anticompetitive conduct.  Inform does not plausibly explain how Google allocates search rankings or cite to any instance where its own search results were negatively affected by implementation of AMP.  These vague allegations about search rankings do not plausibly describe coercion.

The Complaint does not plausibly allege that Google leveraged its purported monopoly power in general search to gain a competitive advantage and cause competitive injury in the market for online video advertising.

    D.  Inform Does Not Plausibly State a Leveraging Claim
        Directed to the DFP Ad Server and Chrome.

Inform's third leveraging theory is set forth in a single paragraph, and asserts that through monopoly power obtained through the DFP ad server and the Chrome browser, Google has "render[ed] online video players incompatible" with Chrome and "disable[d] online video advertisements . . . ."  (Compl't ¶ 299.)  This thinly sketched claim does not describe a leveraging relationship between the DFP ad server and Chrome.  The motion to dismiss this leveraging claim will be granted.

V.    Google's Motion to Dismiss Inform's Individual Theories of
Anticompetitive Conduct Will Be Granted in Part and Denied in Part.

A.    The Complaint Plausibly Alleges that Google's "Denial of
Interoperability" Was Anticompetitive.

The Complaint's allegations about the transition from Flash to HTML5 assert that

Google was able to "set the standard" across the advertising industry for how users viewed

online ads, and assert that it denied interoperability to competitors' products, thereby coercing

competitors into using Google products.  (Compl't ¶¶ 262-66.)  Google urges that these

allegations do not describe anticompetitive conduct.  (Def. Mem. at 12.)  For the reasons already

discussed in relation to Inform's allegations about the transition from Flash to HTML5, the Court

concludes that the Complaint plausibly alleges anticompetitive conduct, and the motion to

dismiss this claim will be denied.

B.    The Motion to Dismiss Inform's Claim about
the Encryption of User IDs Will Be Granted.

Google's motion to dismiss any claim directed to Google's encryption of user IDs

will be granted for the reasons explained in the 2022 Opinion.  627 F. Supp. 3d at 381-83.

Inform attempts to distinguish its allegations about ID encryption from the States by urging that

identifying information came from publishers' client data and should therefore be owned by

publishers like Inform.  (Compl't ¶¶ 268-70.)  The Complaint does not plausibly allege why it

should own this data, which was created by Google based on information gleaned from multiple

sources, or why Google's use of an encrypted ID interfered with Inform's own "proprietary"

method for identifying users and rendered it "useless."  (Compl't ¶ 270.)

Google's motion to dismiss Inform's claim directed to the encryption of user IDs

will be granted.

C.  The Complaint Plausibly Alleges a Claim Premised on Bypassing.

Inform asserts that on high-traffic news days, Google's DFP ad server gave favorable treatment to "programmatic" ads transacted over AdX instead of ads directly sold by Inform, resulting in a larger profit to Google and undercutting the higher profits that Inform earned from direct ad campaigns.  (Compl't ¶¶ 229-235.)  Inform asserts that it was injured by this exclusionary conduct, and that the DFP ad server utilized its monopoly power to undercut competition in the markets for online video advertising and ad exchanges.  (Compl't ¶ 235.)

Inform's "bypassing" allegation plausibly states a claim under section 2.  As described by Inform, Google's DFP ad server is responsible for delivering both the ads that Inform sold directly and the programmatic ads purchased at auction.  (Compl't ¶ 229.)  Google's algorithms decide whether to place a directly sold or programmatic ad.  (Compl't ¶ 229.)  On high-traffic news days, Inform would have more ad space to fill and expected a corresponding increase in ad revenue.  (Compl't ¶ 230.)  According to Inform, however, Google's ad server "bypassed" the directly sold ads that were more lucrative to Inform and instead placed the cheaper programmatic ads transacted on AdX, for which Google obtained "a substantial cut."  (Compl't ¶ 231.)  As an example, Google would bypass a directly sold ad worth $25 to Inform in favor of a $6 programmatic ad from AdX, for which Google would take a fee between 20 and 40 percent.  (Compl't ¶ 231.)  Neither direct advertisers nor competing ad exchanges had an opportunity to fill inventory on these heavy news days.  (Compl't ¶ 232.)  According to Inform, this not only caused immediate revenue loss, but was "a death knell" for direct ad sales because Inform was not able to deliver the ads as promised.  (Compl't ¶¶ 231, 233-34.)

Inform has plausibly alleged that Google engaged in anticompetitive conduct that injured it as a customer of the DFP ad server by undercutting more-profitable direct sales in

order to advantage Google's AdX product.  The DFP ad server deprived Inform of the higher

revenue available from the direct sales to the most relevant advertisers and coerced Inform into

reliance on AdX.  The Complaint describes the exclusion of competition and the control of prices

without a competitive justification to Google's ad-server business.  See PepsiCo, 315 F.3d at

108.  Google's motion to dismiss the claim will be denied.

> D.  The Complaint Plausibly Alleges a Claim Premised on the
>     Implementation of Enhanced Dynamic Allocation ("EDA").

Inform asserts that, similar to the bypassing practices, Google's implementation

of EDA had the effect of harming its direct sales channels and driving more advertisers to the

"programmatic" channels of AdX.  (Compl't ¶¶ 199-200, 202-03, 205, 207.)  As noted, Inform

asserts that its direct ad sales were more lucrative than exchange-transacted ads.  It asserts that

EDA resulted in ads being sold at depressed prices, which injured Inform but benefited Google

because it earned exchange fees through AdX.  (Compl't ¶¶ 208, 211.)  As Google notes, the

2022 Opinion concluded that the States had alleged competitive harm only in the ad-exchange

market, because the States plausibly alleged that EDA "starv[ed]" rival ad exchanges of valuable

impressions.  See 627 F. Supp. 3d at 386.  But Inform, like Gannett, describes a similar type of

competitive injury: the implementation of EDA allowed Google to give itself preferential

treatment over transactions where direct ad buyers were willing to pay a publisher like Inform

more than the prices transacted through Google.  Inform has plausibly alleged a section 2 claim

related to implementation of EDA.

To the extent that Google urges Inform's EDA-based claim is untimely, its

motion will be denied for the reasons discussed in relation to Gannett's claim.  Inform describes

how Google was deceptive and opaque in its implementation of EDA (Compl't ¶¶ 200, 203,

206), and while Inform and others may have voiced questions and concerns about EDA (Compl't

¶ 201), there is no suggestion that Inform had knowledge about EDA's implementation sufficient to plausibly assert a Sherman Act violation.

The motion to dismiss Inform's claim directed to EDA will be denied.

E.  The Complaint Does Not Plausibly Allege a Claim Based on Google's Implementation of Minimum Bid to Win ("MBW").

The Court concluded in the 2024 Private Plaintiff Opinion that the Publishers and Gannett plausibly alleged anticompetitive conduct based on its implementation of MBW.  2024 WL 895155, at *17-18, 28.  But Inform's allegations about MBW are vague, confused, and do not offer any explanation as to how Inform was affected by MBW.  The allegations about MBW state in full:

> Similarly, through Google's market dominance, Google Ads has engaged in a practice of setting unreasonably high minimum bids targeted only at competing products or services in order to foreclose them from meaningful participation in the Google Ads auction system, a practice known as "Minimum Bid to Win."  In doing so, Google has foreclosed participation by its competitors, illegally restrained trade, and stifled competition.

(Compl't ¶ 215.)  These allegations provide no clarity as to the nature of Google's alleged anticompetitive conduct and its claimed effect on Inform.  The Complaint has identified several relevant product markets – ad servers, ad exchanges, online video advertising, and other adjacent markets.  The unelaborated allegation that Google Ads – an ad-buying tool for small advertisers – has "targeted . . . competing products or services" to foreclose them from participating "in the Google Ads auction system" makes little sense.  The allegation does not identify what "competing products" were foreclosed from "participation" and does not explain how Inform was affected by MBW.  Google's motion to dismiss Inform's claim premised on MBW will be granted.

VI.    Inform May Not Pursue Injunctive Relief.

Google urges that the Court should dismiss Inform's prayer for injunctive relief because it is no longer in business and therefore does not have standing to obtain such relief. See, e.g., O'Shea v. Littleton, 414 U.S. 488, 495-96 (1974) ("Past exposure to illegal conduct does not in itself show a present case or controversy regarding injunctive relief, however, if unaccompanied by any continuing, present adverse effects."); Nicosia v. Amazon.com, Inc., 834 F.3d 220, 239 (2d Cir. 2016) ("Plaintiffs lack standing to pursue injunctive relief where they are unable to establish a real or immediate threat of injury.  Although past injuries may provide a basis for standing to seek money damages, they do not confer standing to seek injunctive relief unless the plaintiff can demonstrate that she is likely to be harmed again in the future in a similar way.") (internal citations and quotation marks omitted).

The Complaint includes a prayer for injunctive relief prohibiting Google from carrying out anticompetitive restraints, as well as structural relief that includes unwinding Google's 2008 acquisition of DoubleClick and requiring that several of Google's businesses be separated into independent corporations.  (Compl't at p. 119.)  To the extent that Inform responds to Google's motion, it states in a footnote that "the Court has broad power to fashion relief as it sees fit."  (Opp. Mem. at 30 n.33.)

Because Inform repeatedly alleges that it is no longer in business, it does not allege a real or immediate threat of future injury to it, and therefore cannot obtain injunctive relief.

CONCLUSION.

For the reasons explained, Google's motion to dismiss is GRANTED as to Count II; the leveraging claim asserted as part of Count I; any claim involving Google's encryption of

user IDs; any claim involving Google's implementation of Minimum Bid to Win; and Inform's prayer for injunctive relief.

The remainder of Google's motion is DENIED.  The Clerk is respectfully directed to terminate the motion.  (21 MD 3010, ECF 592; 23 Civ. 1530, ECF 77.)

SO ORDERED.

P. Kevin Castel
United States District Judge

Dated:  New York, New York
        March 7, 2024